IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,987

JUAN A. APODACA,
*Appellant*,

v.

MARK WILLMORE,
MATTHEW WILLMORE, and
OAK RIVER INSURANCE COMPANY,
*Appellees.*

SYLLABUS BY THE COURT

1.

The firefighter's rule first enunciated by this court in *Calvert v. Garvey Elevators, Inc.*, 236 Kan. 570, 694 P.2d 433 (1985), is extended to law enforcement officers.

2.

On the facts of this case, none of the three exceptions to application of the firefighter's rule recognized in *Calvert v. Garvey Elevators, Inc.*, 236 Kan. 570, 694 P.2d 433 (1985), a rule now extended to law enforcement officers, applies.

3.

On the record in this case, the plaintiff is procedurally barred from pursuing adoption of a fourth, willful and wanton conduct exception to the firefighter's rule, now extended to law enforcement officers.

Review of the judgment of the Court of Appeals in 51 Kan. App. 2d 534, 349 P.3d 481 (2015). Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed April 14, 2017.

1

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Roger D. Fincher*, of Bryan, Lykins, Hejtmanek & Fincher, of Topeka, argued the cause and was on the brief for appellant.

*Joel W. Riggs*, of Larson & Blumreich Chartered, of Topeka, argued the cause, and *Craig C. Blumreich*, of the same firm, was on the brief for appellee.

The decision of the court is delivered by

BEIER, J.: In this appeal from summary judgment granted to the defendants in district court, we decide whether to extend a common-law tort doctrine known as the firefighter's rule to law enforcement officers.

We hold that the firefighter's rule first enunciated by this court in *Calvert v. Garvey Elevators, Inc.*, 236 Kan. 570, 694 P.2d 433 (1985), should be extended to law enforcement officers. We therefore affirm the Court of Appeals decision and the judgment of the district court.

FACTUAL BACKGROUND AND DISTRICT COURT PROCEEDINGS

The facts and district court litigation underlying this appeal are described completely and effectively in the Court of Appeals decision, and we incorporate that recitation:

"At about 3:30 a.m. on October 18, 2009, in Riley County, Matthew Willmore was driving his father's 1998 Ford F-150 pickup north on K-177, which is a four-lane highway separated by a grassy median. Less than a mile north of Interstate 70, Willmore fell asleep at the wheel and rolled the pickup across the median. The truck eventually

2

came to a stop on its wheels, blocking the southbound lanes of the highway. Willmore—who was 18 years old at the time of the accident—had drunk several beers at a friend's house earlier that night.

"David McGillis, who was also driving north, witnessed the accident and stopped to assist Willmore. After Willmore exited the pickup truck, he walked to the median where he spoke with McGillis. Willmore then attempted to move the truck but found that it would not start. Although it was dark outside and there were no lights illuminating the highway, Willmore turned off the truck's headlights. He called his parents to inform them of the accident and then began picking up debris from the highway.

"In response to a 911 call from McGillis, a dispatcher for the Riley County Police Department (RCPD) advised officers Juan Apodaca and Jonathan Dulaney—who were patrolling together—about the traffic accident. The dispatcher told the officers that the location of the accident was north of Interstate 70 on K-177 and that the vehicle involved in the accident was in the southbound lanes of the highway. Officer Apodaca acknowledged to the dispatcher that the accident was north of Interstate 70. The dispatcher also informed the officers that nobody was injured in the accident.

"Officer Apodaca drove to the accident scene—with Officer Dulaney in the passenger seat—at a high rate of speed with his emergency lights and sirens activated. Officer Apodaca saw the headlights and flashers from McGillis' vehicle—that was parked on the center-edge of the northbound lanes—from over a mile away, and he believed it was the scene of the accident. Officer Apodaca did not see the disabled pickup in the southbound lanes and struck it while travelling 104 mph. The second accident occurred at 3:42 a.m.

"Around 6 a.m., an evidentiary breath test revealed that Willmore's breath alcohol content was .103. During an interview conducted by a RCPD investigator about 5 months after the accident, Officer Apodaca acknowledged that the dispatcher had told him that the accident was north of Interstate 70 and that the truck was blocking the southbound lanes. But the officer stated that for some reason he envisioned the accident scene being south of Interstate 70. Officer Apodaca did not recall the dispatcher telling

3

him that no one was injured in the accident. Instead, Officer Apodaca stated that he was driving at a high rate of speed because he believed someone may have been injured.

"As a result of the accident, both Officer Apodaca and Officer Dulaney suffered serious injuries. They applied for and received workers' compensation benefits. On October 17, 2011, the officers filed a joint petition in Shawnee County District Court, alleging that Willmore's negligence caused them to suffer personal injuries and related damages. The officers also asserted a claim of negligent entrustment against Willmore's father. A few months later, Oak River Insurance Company—the liability carrier for the RCPD—intervened as a party to the lawsuit.

"On March 22, 2013, Officer Apodaca, Officer Dulaney, and Oak River Insurance Company filed a motion for partial summary judgment concerning the Willmores' claims of comparative fault. One week later, the Willmores also filed a motion for summary judgment. Among other things, the Willmores argued that the firefighter's rule barred all the officers' claims. Shortly thereafter, Officer Dulaney dismissed his claims against the Willmores.

"On March 13, 2014, the district court entered a memorandum decision and order denying the motion for partial summary judgment filed by Officer Apodaca and Oak River Insurance Company but granting summary judgment in favor of the Willmores. In its decision, the district court found that the '[firefighter's] rule should be and is extended to law enforcement officers.' Accordingly, it concluded that the firefighter's rule barred Officer Apodaca from recovering in this negligence action because he was acting within the scope of his duties as a law enforcement officer at the time of the accident.

"Officer Apodaca filed a motion for reconsideration and, for the first time, asserted that Willmore's actions in causing the initial accident were willful, wanton, reckless, or intentional. In an order entered on May 27, 2014, the district court denied Officer Apodaca's motion, concluding 'that the grounds for judgment under K.S.A. 60-259(f) are not presented' and that there 'has been no intervening change in the controlling law, no new evidence which was previously unavailable and there is no manifest injustice to correct.' Moreover, the district court found that the arguments presented in the motion

4

were either 'an attempt to revisit issues already addressed or advance arguments that could have been raised in prior briefing.'" *Apodaca v. Willmore*, 51 Kan. App. 2d 534, 535-37, 349 P.3d 481 (2015).

The remaining plaintiff, Apodaca, appealed to the Court of Appeals, and Judge David E. Bruns wrote for a unanimous panel of the Court of Appeals, affirming the district court. We accepted this case on petition for review.

DISCUSSION

We open with a recitation of the familiar standard of review for summary judgment decisions.

> "When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The district court is required to resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules as the district court." *Apodaca*, 51 Kan. App. 2d at 538 (citing *Stanley Bank v. Parish*, 298 Kan. 755, 759, 317 P.3d 750 [2014]).

As the Court of Appeals acknowledged, summary judgments should be granted with caution in negligence cases. See *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409 (1998). An exception to that general rule applies when the only question presented is one of law. See *Honeycutt v. City of Wichita*, 251 Kan. 451, Syl. ¶ 8, 836 P.2d 1128 (1992) ("In a negligence action, summary judgment is proper if the only

5

questions presented are questions of law."); see also *KNEA v. State*, 305 Kan. 739, 748, 387 P.3d 795 (2017) (when reviewing pure question of law, "'no additional facts need to arise or be developed in the record'"). And the issue of whether the firefighter's rule should be extended to law enforcement officers is such a question. Questions of law are reviewable de novo on appeal. See *Martin v. Naik*, 297 Kan. 241, 245, 300 P.3d 625 (2013) (citing *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 220-21, 262 P.3d 336 [2011]).

*Legal Context of the Firefighter's Rule*

The firefighter's rule prevents an injured firefighter from recovering when his or her injury was caused by the wrong that initially required his or her presence in an official capacity at the scene. It "prohibits firefighters from suing the person who was negligently responsible for causing the fire or other hazard for injuries they suffer in responding to and quelling that hazard, subject to several exceptions." *Apodaca*, 51 Kan. App. 2d at 538. In order to determine whether the rule should be extended to law enforcement officers such as the plaintiff in this case, we must first examine the legal context of the rule.

A party suing to recover for a tortfeasor's negligence must prove the existence of a duty, a breach of that duty, an injury, and proximate cause. *D.W. v. Bliss*, 279 Kan. 726, Syl. ¶ 1, 112 P.3d 232 (2005). Proximate cause is "that cause which '"in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act."'" *Yount v. Deibert*, 282 Kan. 619, 624-25, 147 P.3d 1065 (2006). In determining whether an injury is "the natural and probable consequence of the wrongful act," the Court of Appeals has stated that "'[a] defendant is not responsible for all *possible* consequences of his or her negligence, only those

6

consequences which are *probable* according to ordinary and usual experience.'" *Hale v. Brown*, 38 Kan. App. 2d 495, 496, 167 P.3d 362 (2007).

Historically an injured "rescuer" has been able to recover damages from a person whose negligence created the need for the rescue. See *Brock, Administrator v. Peabody Cooperative Equity Exchange*, 186 Kan. 657, Syl. ¶ 1, 352 P.2d 37 (1960) (not contributory negligence for person to risk life or place in great danger in effort to save another); see also Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 32 (2010) ("if an actor's tortious conduct imperils another or the property of another, the scope of the actor's liability includes any harm to a person resulting from that person's efforts to aid or to protect the imperiled person or property"). This rescue doctrine treats a potential rescuer as among the class of persons to whom a tortfeasor owes a duty as a matter of law. The rescue and rescuer are considered foreseeable, and the initial negligent act is considered the proximate cause of any injury sustained by the rescuer during the course of the rescue.

Many jurisdictions have adopted the firefighter's rule as an exception to the rescue doctrine. See, *e.g.*, *Baldonado v. El Paso Natural Gas Co.*, 143 N.M. 297, 301-02, 176 P.3d 286 (Ct. App. 2006) (firefighter's rule evolved as exception to rescue doctrine; rescuer who could otherwise recover cannot do so if performing duties as professional firefighter). In some jurisdictions, the rule is known as the "professional rescuer's doctrine."

The origins of the firefighter's rule can be traced to *Gibson v. Leonard*, 143 Ill. 182, 32 N.E. 182 (1892), *overruled in part by Dini v. Naiditch*, 20 Ill. 2d 406, 170 N.E.2d 881 (1960). In that case, the Illinois Supreme Court applied the general categories of premises liability and held that firefighters are mere licensees. 143 Ill. at 190. Because

7

firefighters are licensees, an owner has no obligation "to provide against the dangers of accident." 143 Ill. at 190.

It was not until 1985 that this court was called upon to address the firefighter's rule for the first time. In the 93 years since the rule's inception in 1892, the doctrinal basis for its adoption and continued vitality had shifted. Traditional premises liability categories had begun to fall out of favor. See *Britt v. Allen County Community Jr. College*, 230 Kan. 502, 505-07, 638 P.2d 914 (1982) (discussing trend of jurisdictions abolishing traditional common-law premises liability categorizations; declining to abolish doctrine in Kansas), *overruled by Jones v. Hanson*, 254 Kan. 499, Syl. ¶ 1, 867 P.2d 303 (1994) (abolishing traditional premises liability categories in Kansas). And assumption of risk, see *Fletcher v. Illinois Central Gulf Railroad Co.*, 679 S.W.2d 240, 243 (Ky. App. 1984) (firefighter "must be deemed to have assumed the personal risks inherent in dealing with the emergency which necessitated his presence"); *Krauth v. Geller*, 31 N.J. 270, 273-74, 157 A.2d 129 (1960) (firefighter "cannot complain of negligence in the creation of the very occasion for his engagement"), had lost some of its persuasive force as increasing numbers of jurisdictions adopted comparative fault. Thus, when this court ultimately adopted the firefighter's rule in *Calvert*, 236 Kan. 570, it grounded its decision on public policy.

Plaintiff Donald Calvert was among the firefighters to respond to an anhydrous ammonia leak at the Garvey Elevator complex in Seward. Once on the scene, Calvert attempted to rescue a man who had collapsed near the leak. Despite wearing a respirator, Calvert inhaled some of the fumes and suffered a heart attack as a result.

Calvert filed suit against Chevron Chemical, the owner of a storage tank the anhydrous ammonia had been stored in, and Garvey Elevators, seeking damages for his

injuries. The district judge determined that the firefighter's rule should bar recovery because Calvert was discharging his duties as a firefighter at the time of his injury.

When this court addressed the rule on appeal, it began its analysis by reciting its typical formulation:  "[A] fire fighter who enters upon the premises of another in the discharge of his duty may not maintain a cause of action against the individual for negligence in creating a risk which necessitated a fire fighter's presence and resulted in injury to the fire fighter." 236 Kan. at 572.

The court noted that several different legal theories had been used to support the rule but that most jurisdictions had adopted some form of it. 236 Kan. at 572. The court surveyed four specific legal bases cited by others:  premises liability, assumption of the risk, employment-based assumption of the risk, and public policy.

Regarding premises liability, the court observed that some jurisdictions had categorized firefighters as a "licensee." 236 Kan. at 572-73 (citing *Price v. Morgan*, 436 So. 2d 1116 [Fla. Dist. App. 1983]; *Buchanan v. Prickett & Son, Inc.*, 203 Neb. 684, 279 N.W.2d 855 [1979]; *Baxley v. Williams Construction Co.*, 98 Ga. App. 662, 106 S.E.2d 799 [1958]). In Kansas, a "licensee" was "one who enters or remains on the premises of another by virtue of either the express or implied consent of the possessor of the premises," and the only duty owed by an owner or occupant of land to a licensee was "to refrain from injuring the licensee willfully or wantonly." *Calvert*, 236 Kan. at 573.

Other jurisdictions had rejected licensee status for firefighters and instead determined that they were "invitees." 236 Kan. at 573 (citing *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill. 2d 552, 328 N.E.2d 538 [1975]; *Wash, et al. v. Madison Park Properties, Ltd.*, 102 N.J. Super. 134, 245 A.2d 512 [1968]). An "invitee" was "one who enters or remains on the premises for the benefit of the inviter, or for the mutual benefit and

advantage of both the inviter and invitee." *Calvert*, 236 Kan. at 573. A property owner or occupant would owe an invitee a duty of "reasonable or ordinary care for the invitee's safety" and had the duty "to protect and warn an invitee of a danger that may be reasonably anticipated." *Calvert*, 236 Kan. at 573.

Still other jurisdictions rejected both licensee and invitee classifications and instead held firefighters to be sui generis. 236 Kan. at 573 (citing *Krauth v. Israel Geller and Buckingham Homes, Inc.*, 31 N.J. 270, 157 A.2d 129 [1960]; *Beedenbender v. Midtown Properties*, 4 App. Div. 2d 276, 164 N.Y.S.2d 276 [1957]). "When classified as sui generis, one of that class is privileged to enter the land for a public purpose, irrespective of consent." *Calvert*, 236 Kan. at 573. The duty owed to such a person would be similar to that owed to an invitee. 236 Kan. at 573.

The *Calvert* court then turned to assumption of the risk, acknowledging that a number of jurisdictions had relied on the doctrine in adopting the firefighter's rule. 236 Kan. at 573-74 (citing *Baker v. Superior Court*, 129 Cal. App. 3d 710, 181 Cal. Rptr. 311 [1982]; *Krauth*, 31 N.J. 270). "The Fireman's Rule is not based upon 'express' assumption of the risk, *i.e.*, where parties contract with each other so that one accepts the risk of harm which is instant to the other's conduct, but rather upon 'implied' assumption of the risk." 236 Kan. at 573-74. Moreover, assumption of risk can be divided into "primary" and "secondary" assumption of risk. Primary assumption of risk "relieves an individual of a duty which he might otherwise owe another with respect to a particular risk." 236 Kan. at 574. It is an "an absolute bar to a fire fighter's recovery; it dictates that the occupier of the premises did not owe the individual fireman any duty of care." 236 Kan. at 574; see also *Armstrong v. Mailand*, 284 N.W.2d 343, 349-50 (Minn. 1979) (The firefighter's rule "'is not unique to landowner cases but is applicable to our entire system of justice[;] one who has knowingly and voluntarily confronted a hazard cannot recover for injuries sustained thereby.'"). In contrast, secondary assumption of a risk "occurs when the individual

10

voluntarily encounters a known, appreciated risk without an intended manifestation by that individual that he consents to relieve another of his duty." *Calvert*, 236 Kan. at 574. Because of the then-current state of the doctrine of assumption of the risk in Kansas, the *Calvert* court said that adopting it as the basis for the firefighter's rule would require use of the secondary form "where a master/servant relationship is involved." 236 Kan. at 574. "[A]n individual taxpayer, as occupant of the premises, [would be regarded as] the employer of the fire fighter employee." 236 Kan. at 574-75. Since *Calvert*, this court has abolished the doctrine of assumption of the risk in the master/servant setting. See *Simmons v. Porter*, 298 Kan. 299, Syl. ¶ 6, 312 P.3d 345 (2013) (rationale for retaining assumption of the risk doctrine no longer viable in Kansas, given statutory comparative fault rules).

The *Calvert* court next considered and rejected employment-based assumption of the risk as a basis for adoption of the firefighter's rule. Some jurisdictions had "determined that a fire fighter is a public safety officer, and that a public safety officer, by accepting salary and fringe benefits, assumes the risk normal to employment." 236 Kan. at 575 (citing *Walters v. Sloan*, 20 Cal. 3d 199, 142 Cal. Rptr. 152, 571 P.2d 609 [1977]). Under such a theory, firefighters are paid for the work they perform, and when injury occurs, compensation is provided. That compensation might be medical and disability benefits under workers compensation acts or, in some instances, special benefits provided under public employee retirement systems. *Calvert*, 236 Kan. at 575. For example, the court noted that the Kansas Legislature had created a Firefighter's Relief Fund to provide monetary relief for firefighters injured or disabled on the job. 236 Kan. at 575.

Finally, the *Calvert* court cited and followed jurisdictions that had adopted the firefighter's rule on public policy grounds.

11

"[A] fire fighter cannot recover for injuries caused by the very situation that initially required his presence in an official capacity and subjected him to harm. Public policy precludes recovery against an individual whose negligence created the very need for the presence of the fire fighter at the scene in his professional capacity. See *Walters v. Sloan*, 20 Cal. 3d 199, 142 Cal. Rptr. 152, 571 P.2d 609 (1977); *Grable v. Varela*, 115 Ariz. 222, 564 P.2d 911 (App. 1977); *Washington v. Atlantic Richfield Co.*, 66 Ill. 2d 103, 5 Ill. Dec. 143, 361 N.E.2d 282 (1976); *Romedy v. Johnston*, 193 So. 2d 487 (Fla. Dist. App. 1967); *Clark v. Corby*, 75 Wis. 2d 292, 249 N.W.2d 567 (1977); *Buren v. Midwest Industries, Inc.*, 380 S.W.2d 96 (Ky. 1964).

"Fire fighters enter on the premises to discharge their duties. Fire fighters are present upon the premises, not because of any private duty owed the occupant, but because of the duty owed to the public as a whole. In populous areas fire fighters are first concerned with keeping a fire confined and preventing it from spreading to other structures, and then with the preservation of the burning property.

"We now hold that it is a public policy of the State of Kansas that a fire fighter cannot recover for injuries caused by the very wrong that initially required his presence in an official capacity and subjected the fire fighter to harm; that public policy precludes recovery against an individual whose negligence created a need for the presence of the fire fighter at the scene in his professional capacity." *Calvert*, 236 Kan. at 575-76.

The *Calvert* court also outlined three exceptions to the rule. First, a firefighter is not barred "from recovery for negligence or intentional acts of misconduct by a third party." 236 Kan. at 576. Second, a firefighter is not barred from recovery if the individual responsible for the firefighter's presence engages in a subsequent act of negligence after the firefighter arrives at the scene. 236 Kan. at 576. Third, a firefighter is not barred from recovery "if an individual fails to warn of known, hidden dangers on his premises or for misrepresenting the nature of the hazard where such misconduct causes the injury to the fire fighter." 236 Kan. at 576. Ultimately, a firefighter "only assumes hazards which are

12

known and can be reasonably anticipated at the site of the fire and are a part of fire fighting." 236 Kan. at 576.

Applying the newly announced rule to the facts before it, the court held that Calvert was discharging his duties as a firefighter when he was injured, and therefore defendants could not be liable for Calvert's injury. 236 Kan. at 577. The court explicitly rejected Calvert's argument that the rule should not apply because ultra-hazardous material—anhydrous ammonia—was involved. According to the court, part of Calvert's job was to protect the public in situations where poisonous gas had escaped. 236 Kan. at 576-77.

Since the *Calvert* decision, only one other Kansas Supreme Court case has addressed the firefighter's rule. In that case, *McKernan v. General Motors Corp.*, 269 Kan. 131, 3 P.3d 1261 (2000), the court considered whether a firefighter who had been injured when a car hood strut exploded while he was attempting to extinguish a car fire could recover from the automobile manufacturer on a products liability theory. The court weighed the public policy bases for the firefighter's rule against the public policy bases for products liability claims and held that the manufacturer's negligence had not created the risk that had necessitated the firefighter's presence; thus allowing products liability claims would not frustrate the public policy underlying the firefighter's rule. Rather, it would "promote[] the public policy of fixing responsibility for defective products on the party who introduces the product to the [marketplace]." 269 Kan. at 140-41.

One more aspect of this court's previous application of the Kansas firefighter's rule bears brief mention:  Although this court has not addressed the applicability of the firefighter's rule to law enforcement officers, *Calvert* itself did not apply the rule to a traditional firefighting situation. Plaintiff Calvert, a licensed emergency medical

13

technician, was responding to an anhydrous ammonia leak rather than a fire, and he was in charge of the ambulance dispatched to the scene.

*Status of the Firefighter's Rule in Other Jurisdictions*

More than 30 jurisdictions in the United States have adopted the firefighter's rule, overwhelmingly by court decision rather than by statute. See, *e.g.*, *Gregory v. Cott*, 59 Cal. 4th 996, 1012 n.11, 331 P.3d 179 (2014) (acknowledging statutory limitations to firefighter's rule under California law); *Pottebaum v. Hinds*, 347 N.W.2d 642, 643 (Iowa 1984) (adopting "narrow rule denying recovery to a firefighter and policeman whenever their injuries are caused by the very wrong that initially required the presence of an officer in his official capacity and subjected him to harm"); *Phillips v. Hallmark Cards, Inc.*, 722 S.W.2d 86, 89 (Mo. 1986) (declining to abrogate firefighter's rule in Missouri).

The states adopting the rule include those such as Kansas and Alaska, which have relied on a public policy rationale. See *Calvert*, 236 Kan. at 576; *Moody v. Delta Western, Inc.*, 38 P.3d 1139, 1139-40 (Alaska 2002). As the Court of Appeals noted in this case, the Supreme Court of Alaska focused on the nature of the relationship between firefighters and the public they are sworn to serve.

> "[I]n *Moody v. Delta Western, Inc.*, 38 P.3d 1139, 1142 (Alaska 2002), the [c]ourt found that the rule 'reflects sound public policy' because '[t]he public pays for emergency responses of public safety officials in the form of salaries and enhanced benefits. Requiring members of the public to pay for injuries incurred by officers in such responses asks an individual to pay again for services the community has collectively purchased.'" *Apodaca*, 51 Kan. App. 2d at 539.

States that have codified the firefighter's rule include California, Nevada, and New Hampshire. See Cal. Civil Code § 1714.9 (firefighters, among others, permitted to bring

14

action for negligence in course of performing duty only under enumerated circumstances, such as for conduct occurring after firefighter arrives at scene); Nev. Rev. Stat. § 41.139 (same); N.H. Rev. Stat. Ann. § 507:8-H (2010) ("Firefighters, emergency medical technicians . . . , police officers, and other public safety officers shall have no cause of action for injuries incurred during the performance of duties incidental to and inherent in the officer's official engagement arising from negligent conduct of the person or persons requiring the officer's services of the homeowner or lessee of the premises on which such duties were performed.").

Approximately 10 states do not appear to have addressed the firefighter's rule at all.

Of the remaining states, Florida, Illinois, Massachusetts, Minnesota, New Jersey, and New York have abolished or severely limited the rule by statute. See Fla. Stat. § 112.182 (firefighter or law enforcement officer who lawfully enters premises in discharge of duties is "invitee"; common-law rule that such person is "licensee" abolished); Ill. Comp. Stat. ch. 425 25/9f (2006) ("The owner or occupier of the premises . . . owe[s] fire fighters who are on the premises in the performance of their official duties . . . a duty of reasonable care in the maintenance of the premises . . . . The owner or occupier of the premises . . . are not relieved of the duty of reasonable care if the fire fighter is injured due to the lack of maintenance of the premises in the course of responding to a fire."); Minn. Stat. § 604.06; Minn. Stat. § 299A.41 ("The common law doctrine known as the fireman's rule shall not operate to deny any peace officer . . . or public safety officer . . . a recovery in any action at law or authorized by statute."; "public safety officer" defined to include firefighter); N.J. Stat. Ann. § 2A:62A-21 ("whenever any law enforcement officer, firefighter, or member of a duly incorporated first aid, emergency, ambulance or rescue squad association suffers any injury, disease or death while in the lawful discharge of his official duties and the injury, disease or death is directly or indirectly the result of

the neglect, willful omission, or willful or culpable conduct of any person[, the injured party] may seek recovery and damages from the person [who caused the injury]"); N.Y. General Obligations Law § 11-106 ("whenever any police officer or firefighter suffers any injury, disease or death while in the lawful discharge of his official duties and that injury, disease or death is proximately caused by the neglect, willful omission, or intentional, willful or culpable conduct of any person . . . that police officer or firefighter may seek recovery and damages from the person [who caused the injury]"); see also *Flaherty v. Walgreen Eastern Co., Inc.*, 18 Mass. L. Rptr. 661, n.3 (2005) (firefighter's rule has no continuing validity in Massachusetts; citing Mass. Gen. L. ch. 41, §§ 100 and 111F). Oregon and South Carolina have abolished or declined to adopt the firefighter's rule by judicial decision. See *Christensen v. Murphy*, 296 Or. 610, 620, 678 P.2d 1210 (1984) (because of statutory abolition of implied assumption of risk, firefighter's rule abolished in Oregon as rule of law); *Minnich v. Med-Waste, Inc.*, 349 S.C. 567, 575, 564 S.E.2d 98 (2002) (declining to adopt rule; "no uniform justification" for adoption nor "consistent application of the rule"; rule riddled with exceptions; criticism of rule abounds).

To date, the Kansas Legislature has taken no action to codify, limit, or abrogate the *Calvert* holding adopting the firefighter's rule.

*Extension of the Firefighter's Rule to Law Enforcement in Other Jurisdictions*

In our sister jurisdictions that have adopted the firefighter's rule, approximately 25 have extended it to police officers and in many cases, other public safety officers. See, *e.g*., *Read v. Keyfauver,* 233 Ariz. 32, 38, 308 P.3d 1183 (Ct. App. 2013), *rev. denied* February 11, 2014 (applying firefighter's rule to police officer); *Nowicki v. Pigue*, 2013 Ark. 499, 430 S.W.3d 765, 769-71 (2013) (applying firefighter's rule to roadside-assistance worker); *Ruffing v. Ada County Paramedics*, 145 Idaho 943, 946, 188 P.3d 885

16

(2008) (under Idaho law, "neither a firefighter nor a police officer may recover in tort when his injuries are caused by the same conduct that required his official presence"); *Babes Showclub, Jaba, Inc. v. Lair*, 918 N.E.2d 308 (Ind. 2009) (applying firefighter's rule to police officer); *Davis v. Pinson*, 279 Ga. App. 606, 607-08, 631 S.E.2d 805 (2006) (acknowledging extension of firefighter's rule to police officers under Georgia law, declining to apply the rule on the facts of the case before it).

So far, only one state that has adopted the firefighter's rule has declined to extend it to police officers. That state is Wisconsin. See *Cole v. Hubanks*, 272 Wis. 2d 539, 681 N.W.2d 147 (2004).

In *Cole*, police officer Julia Cole was bitten by a dog she found while on patrol. Cole brought suit against the owners of the dog, alleging that they had negligently cared for and restrained their pet.

Wisconsin had adopted the firefighter's rule on public policy grounds that were "very narrowly drawn." 272 Wis. 2d at 546. On appeal, the Wisconsin Supreme Court noted that "[w]hen we employ public policy factors to preclude a claim for relief, we assume there is negligence and that the negligence was a cause of the injury, but for reasons of public policy, we prevent the claim from proceeding." 272 Wis. 2d at 546. Wisconsin had adopted six public policy considerations used to limit liability:

> "(1) the injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance for recovery would enter a field that has no sensible or just stopping point." 272 Wis. 2d at 546.

17

In Wisconsin, application of the six factors proceeds on a case-by-case basis because "claim-specific facts are often relevant to the analysis." 272 Wis. 2d at 546-47. When it originally adopted the firefighter's rule, the court relied on the fourth and sixth rationales. 272 Wis. 2d at 547.

> "[N]early all fires are started by negligence. However, to subject a landowner or occupier to liability for such negligence would 'place too great a burden' on landowners and occupiers, who should summon the help necessary to extinguish the blaze and prevent its spread to neighboring buildings and property. *Id.* Our concern focused on a greater good to be protected: promoting conduct that would lead to extinguishing a fire before it could spread. However, our relief from liability was very narrowly drawn. We explained that while we were precluding liability for one who negligently starts a fire and the fire causes injury to a firefighter from fighting the fire, we were not 'hold[ing] a landowner under no circumstances must respond in damages for his negligence which caused injury to a firefighter upon the premises.' *Id.* We cautioned that, 'We do not by this decision venture into other areas of negligence where liability is based upon something more than the negligent starting of a fire.' *Id.*" 272 Wis. 2d at 547.

After discussing earlier Wisconsin cases that had applied the rule to firefighters, see *Huauadboldt v. Union Carbide Corp.*, 160 Wis. 2d 662, 467 N.W.2d 508 (1991); *Wright v. Coleman*, 148 Wis. 2d 897, 436 N.W.2d 864 (1989); *Clark v. Corby*, 75 Wis. 2d 292, 249 N.W.2d 567 (1977); *Haas v. Chicago and North Western Ry.*, 48 Wis. 2d 321, 179 N.W.2d 885 (1970), the *Cole* court then discussed *Pinter v. American Family Mut. Ins. Co.*, 236 Wis. 2d 137, 613 N.W.2d 110 (2000). *Cole*, 272 Wis. 2d at 549.

In *Pinter*, an EMT had suffered a back injury while extracting a passenger from a car involved in an accident. The EMT sued the drivers involved based on their negligence in causing the accident that necessitated the EMT's presence. The *Pinter* court extended the rule to the EMT's situation because

18

"permitting an EMT to sue for injuries he received when aiding a person injured in a car accident would place too unreasonable a burden on drivers who negligently cause accidents. . . . [B]urdening the negligent party with liability could deter him from summoning necessary aid and that could have a detrimental effect on all who use Wisconsin's highways." 272 Wis. 2d at 550.

The court also offered three further rationales for its decision: First, allowing such a suit "would enter a field with no sensible or just stopping point." Second, the injury "was too remote from the negligence that caused the accident." And, third, the only negligence complained of was "'the same negligence that caused the initial emergency and resulted in rescue personnel being called to the scene.'" 272 Wis. 2d at 550-51.

Having laid out the pertinent Wisconsin precedent, the *Cole* court declined to extend application of the firefighter's rule to police officers in all situations, preferring to employ a case-by-case method of evaluation. On the specific dog-bite facts before it, the court held that the rule would not bar the officer's recovery.

"There are many differences between firefighters and police officers. For example, firefighters know they are exposed to danger when they are called to fight a fire. As we noted in *Hass,* '[t]he call to duty is the warning of the hazard.' *Hass,* 48 Wis. 2d at 325, 179 N.W.2d 885. By contrast, police officers usually are out on patrol from the start of their shift until its end. Their efforts are not directed to one hazard, but rather they are often required to address varied circumstances, the responses to which may not always be apparent simply from the fact that they are police officers. Furthermore, firefighters and EMTs receive specialized training in fighting fires and in moving injured people at the scene of an accident, on a regular basis. While capturing stray dogs can fall within police officers' duties on occasion, they receive no specialized training to do so and it appears not to be a central focus of their day's activities. And finally, focusing too heavily on the plaintiff's occupation has the danger of permitting assumption of risk to be an absolute defense to a negligence claim, without expressly saying so. Therefore, any

19

limit on the right to sue may also evaluate relevant public policy concerns in light of the particular claims made. As we have explained above, the public policy factors are the basis of the firefighters rule; therefore, they form the basis for our analysis here." *Cole*, 272 Wis. 2d at 553.

The court noted that Cole's injury was not too remote from the dog owners' alleged negligence. Also, the injury was not "wholly out of proportion to the [defendants'] culpability." 272 Wis. 2d at 554. Finally, the defendants had not reported the dog missing or otherwise warned law enforcement that it could be vicious; in other words, Cole had not been responding to a specific call based on the initial negligence at the time she was bitten. In short, the court's decision not to extend the firefighter's rule was based on the specific facts of the case before it rather than on a bright-line rule that the rule can never be applied to bar recovery by a law enforcement officer.

In addition to the Wisconsin *Cole* case, we note that the extension of the firefighter's rule to bar suit by law enforcement officers has been met with dissent in some jurisdictions. See *Berko v. Freda*, 93 N.J. 81, 94, 459 A.2d 663 (1983) (Handler, J., dissenting) (arguing that being "'paid to confront crises and allay dangers'" should not negate duty of care), *superseded by statute as stated in Rowe v. Mazel Thirty, LLC*, 209 N.J. 35, 34 A.3d 1248 (2012); *Walters v. Sloan*, 20 Cal. 3d 199, 208, 142 Cal. Rptr. 152, 571 P.2d 609 (1977) (Tobriner, acting C.J., dissenting) (arguing that firefighter's rule should not apply to either police officers or firefighters). But such dissents have generally opposed the application of the firefighter's rule at all rather than drawing a line between firefighters and police officers.

In his brief, Apodaca argues against extending the firefighter's rule to him and his fellow law enforcement officers for several reasons. First, he argues that *Calvert* was based in part on the Firefighters Relief Act, K.S.A. 40-1701 *et seq.*, providing compensation for firefighters injured or killed on the job while there is no similar fund for police officers. Second, he notes that "firefighters are generally called to premises to fight fires," implying that a police officer's duties encompass many activities in addition to responding to specific calls. He also argues that the firefighter's rule applies to "emergencies whose creation [is] complete," and a firefighter "is generally not facing a conscious adversary who is actively thwarting the fire fighter's efforts." In general, "[t]he types of emergencies police officers respond to . . . put them in a different category than fire fighters and give rise to different policy concerns."

Apodaca concludes his argument by noting instances in which he believes police officers would be barred from recovery if the firefighter's rule is extended: "[S]uch officers would be precluded from bringing a cause of action against the domestic violence participant who batters the police officer, a fleeing suspect who causes an accident during a high speed vehicle pursuit, or the owner of a vicious dog that negligently allowed the dog to run at large [when the dog later bit] the officer." Liability in all of these situations, Apodaca asserts, would be barred "because [the officer] would have been injured by the very reason that caused the officer to respond to the scene."

Apodaca's arguments are unpersuasive.

To begin with, Apodaca's first argument that Kansas' firefighter's rule is based on the existence of the Firefighters Relief Fund significantly overreads the *Calvert* court's reference to the Fund. Its discussion merely demonstrated that firefighters are public

safety officers who assume risks inherent in their profession; a firefighter's "liberal" compensation, including benefits such as the Fund, justified prohibiting firefighters from recovering from tortfeasors for injuries sustained while performing the duties of their job. Ultimately, the *Calvert* court rejected the assumption of the risk rationale for the firefighter's rule, instead relying upon broader public policy principles.

Apodaca also puts undue emphasis on *Calvert*'s reference to firefighters responding to calls on specific "premises." Again, the *Calvert* court explicitly rejected any connection between the basis for the rule and premises law concepts and classifications. See *Calvert*, 236 Kan. at 576. The actual rule announced in *Calvert* referred to a firefighter's presence at the "scene." See 236 Kan. 570, Syl. ¶ 2. There is no indication in *Calvert* or in *McKernan* that a firefighter is prohibited from recovering only if he or she was injured while responding to a call at a home or business; nor is a firefighter prohibited from recovering just for injuries suffered while fighting a fire. A firefighter is prohibited from recovering based on the initial act of negligence regardless of whether the call is to a traffic accident or someone's home, to a fire or some other emergency.

In addition, Apodaca's efforts to distinguish firefighters and law enforcement officers ignore the many instances in which their duties overlap or are similar. The circumstances of this case are illustrative. Both police officers and firefighters often respond to traffic accidents. Although he is correct that police officers generally do not fight fires, their general duty is the same as a firefighter's—to neutralize hazards and provide for the safety of the public. See *State v. Vistuba,* 251 Kan. 821, 824, 840 P.2d 511 (1992) (law enforcement officers frequently called upon to perform public safety duties such as investigation of vehicle accidents "'in which there is no claim of criminal liability'") (quoting *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 [1973]).

22

We also reject Apodaca's argument that the negligence causing the hazard a firefighter responds to is complete by the time the firefighter arrives at the scene while the act necessitating a call to a police officer may still be ongoing or may take the form of a "conscious adversary." Both aspects of this argument are misdirected—attacking a rule considerably broader than that adopted in *Calvert*. The firefighter's rule holding in *Calvert* included an express exception for hazards that develop after a firefighter arrives on a scene. The rule also was confined to negligence actions; it had no bearing on situations in which an intentional tort is committed by a "conscious adversary." As the court said,

> "it is a public policy of the State of Kansas that a fire fighter cannot recover for injuries caused by the very wrong that initially required his presence in an official capacity and subjected the fire fighter to harm; *that public policy precludes recovery against an individual whose negligence created a need for the presence of the fire fighter at the scene in his professional capacity*." (Emphasis added.) 236 Kan. at 576.

The broader legal context of the rule makes clear its historical limitation to negligence causes of action. The rule was, in essence, an exception to the traditional rescuer's doctrine for professional rescuers. See *Baldonado*, 143 N.M. at 301-02. It dealt with establishment of a duty, and a duty is an element of negligence. *D.W. v. Bliss*, 279 Kan. 726, Syl. ¶ 1, 112 P.3d 232 (2005). In contrast, there is generally no requirement to establish a duty to recover on a claim based on an intentional tort. See, *e.g.*, *Striklin v. Parsons Stockyard Co.*, 192 Kan. 360, 366, 388 P.2d 824 (1964) (gravamen of civil assault and battery actor's intention to inflict injury; distinct from unintentional negligence). To the extent that an intentional tort is based on a duty, it is merely a duty "to abstain from causing a willful or intentional injury to others," *i.e.*, a duty owed to all. 74 Am. Jur. 2d, Torts § 17, p. 167. An intentional tort plaintiff thus need not prove that a duty was owed to himself or herself individually.

23

It also is worth noting that the firefighter's rule adopted in *Calvert* is limited in other ways as well. It does not absolve third parties from liability. It would not, for example, preclude recovery from a party who negligently collided with a firetruck on its way to a fire. See *Calvert*, 236 Kan. 570, Syl. ¶ 2. Even the initial tortfeasor is still under a duty to warn of "known, hidden dangers" or to not "misrepresent[] the nature of the hazard." 236 Kan. 570, Syl. ¶ 3. And the initial tortfeasor remains liable for any acts of negligence or misconduct that occur after the arrival of the firefighter. 236 Kan. 570, Syl. ¶ 2. The rule excluding liability is focused on "the very situation that initially required" the firefighter's presence. 236 Kan. 570, Syl. ¶ 1.

The Court of Appeals panel cited and discussed a federal District of Kansas case in which the presiding district magistrate judge anticipated the issue facing us today:

"In *Buck v. B&W, Inc.*, No. 98-2405-GTV, 1999 WL 1007682 (D. Kan. 1999) (unpublished opinion), a Kansas Department of Transportation (KDOT) employee was called to direct traffic at the scene of an accident where a truck transporting cattle had overturned. While directing traffic at the scene, a steer escaped from the overturned trailer, charged the KDOT employee, and caused him to injure his knee. The Honorable G. Thomas VanBebber noted that although directing traffic at an accident scene was not a typical duty performed by KDOT employees, law enforcement officers often relied upon KDOT employees to direct traffic when another officer was unavailable to assist. 1999 WL 1007682, at *1.

"In *Buck*, Judge VanBebber wrote that although Kansas courts had not discussed the issue, other jurisdictions had 'invariably' extended the firefighter's rule to include law enforcement officers. 1999 WL 1007682, at *2. Similarly, Judge VanBebber concluded that the public policy expressed by the Kansas Supreme Court in *Calvert* applied equally to both firefighters and law enforcement officers. In doing so, he found the public should 'be confident that in requesting the assistance of law enforcement officers to aid in

24

situations where their own negligence has created a threat to public safety, they will not be held liable for injuries caused . . . as a result of the risks [they] created.' 1999 WL 1007682, at *2." *Apodaca*, 51 Kan. App. 2d at 542.

Like Judge VanBebber, we are convinced that extension of the limited firefighter's rule of *Calvert* to law enforcement officers is the wisest course for Kansas, and we so hold. Not only is extension of the rule consistent with the common law and statutory law developed in the clear majority of our sister jurisdictions, it is also consistent with the public policy rationale that prompted this court to adopt the firefighter's rule in the first place. Also, as Judge Bruns observed in his decision for the Court of Appeals panel:

"[A]s public safety officers—both firefighters and law enforcement officers—are called upon to respond to a wide range of emergencies in their official capacities. They do so not because of any private duty owed to an individual but because of their sworn duty to the public as a whole. Moreover, like firefighters, law enforcement officers are employed at the taxpayers' expense for the express purpose of dealing with such emergencies. It would be fundamentally unfair to allow a law enforcement officer to seek to recover damages from one who causes an automobile accident but deny this right to a firefighter injured while responding to the same accident." 51 Kan. App. 2d at 544.

In sum, law enforcement officers, like firefighters, who suffer injuries as a result of discharging their duties at the scene of negligently caused hazards or conditions their jobs require them to mitigate and eliminate cannot recover from the person or persons responsible for the existence of the hazards or conditions, unless one of the three exceptions provided for in *Calvert* applies. Under those exceptions, a law enforcement officer will not be barred "from recovery for negligence or intentional acts of misconduct by a third party," if the individual responsible for the firefighter's presence engages in a subsequent act of negligence after the firefighter arrives at the scene, or "if an individual fails to warn of known, hidden dangers on his premises" or misrepresents "the nature of

25

the hazard where such misconduct causes the injury to the fire fighter." *Calvert*, 236 Kan. at 576.

Before turning to the application of the rule to the case before us today, we pause briefly to address the fundamental flaw of the dissents written and joined by three of our colleagues: They are largely if not completely dependent on factual scenarios not present and legal arguments not pursued by the parties. As one of those colleagues has recently observed, an appellate court such as ours should be reluctant to base dispositive rulings on such novelty because it "would be a disservice to the litigants and the process they should expect in a Kansas courtroom." *Lumry v. State*, 305 Kan. 545, 574, 385 P.3d 479 (2016) (Biles, J., concurring).

*Impact of Rule Extension on Plaintiff Law Enforcement Officer's Claims*

Apodaca alleged multiple negligent acts by Willmore that had caused the collision between Apodaca's cruiser and Willmore's pickup. Apodaca also alleged a single claim of negligent entrustment against Willmore's father. The district judge granted summary judgment to defendants on all claims because of application of the firefighter's rule. The multiple acts of negligence alleged against Willmore can be grouped into two categories: those leading to the single-vehicle accident and those occurring immediately after the accident, such as failing to keep the pickup's headlights and taillights on after the flipped truck had come to rest on its wheels in the southbound lanes of the highway. The district judge and the parties have treated the claim of negligent entrustment against Willmore's father as inevitably linked to and dependent upon the negligence claim against Willmore. Under their apparent theory, if the firefighter's rule bars recovery against Willmore for negligence it also bars recovery against his father for negligent entrustment. We take no position on the correctness of this theory, as Apodaca has not challenged that portion of the district judge's summary judgment ruling in the appeal before us.

Apodaca essentially concedes that he seeks to recover "for injuries caused by the very situation that initially required" his presence at the scene of Willmore's accident, which would mean that the firefighter's rule prohibits him from recovering. See *Calvert*, 236 Kan. 570, Syl. ¶ 1. But he argues that exceptions to the rule should save his lawsuit.

Apodaca focuses first on the exception for failing to "warn of known, hidden dangers." See 236 Kan. 570, Syl. ¶ 3. Because Willmore turned off the truck's headlights and taillights and did not turn on its emergency flashers, Apodaca argues that it was not possible for him to see the pickup in the dark; thus the disabled truck was a known, hidden danger.

Beyond articulating the exception for failing to warn of a known, hidden danger, this court has not previously described the contours of the exception. Other courts have noted that the person must have had knowledge of the danger and an opportunity to warn of it. See *Hart v. Swaroop*, 385 Md. 514, 522, 870 A.2d 157 (2005). Moreover, a hidden danger for a firefighter or law enforcement officer may differ from that for an ordinary citizen.

> "'[A]n open elevator shaft is not a "hidden danger" of which firemen must be warned. In Flower's declaration, he alleged that he was evacuating tenants from a "hallway of a building where there was heavy smoke." An open elevator shaft concealed by the smoke of the fire is not a hidden danger in the sense of an *unreasonable danger that a fireman could not anticipate upon attempting to perform his firefighting duties.*'" (Emphasis added.) 385 Md. at 525 (quoting *Flowers v. Rock Creek Terrace*, 308 Md. 432, 451-52, 520 A.2d 361 [1987]).

On the facts of this case, as recited by the district judge in the summary judgment ruling, Apodaca had been warned about the position of Willmore's pickup. Although

27

Willmore himself may not have warned Apodaca directly of the danger—the information may have been transmitted through the person who stopped at the scene to assist Willmore and the 911 operator or dispatcher—Apodaca was fully informed. The public policy underlying the exception seeks to ensure that the existence of a danger is communicated to a first responder. That policy goal was met by the description of the accident scene Apodaca received in this case.

Furthermore, we note that the particular danger in this case, a truck blocking the road, was of the type a law enforcement officer responding to the scene of an accident should be able to anticipate, in a way that an ordinary citizen might not. This fact reinforces our decision that the hidden danger exception does not apply to allow Apodaca's claims against the defendants to proceed.

The next exception Apodaca invokes deals with a subsequent act of negligence by Willmore. Apodaca argues that Willmore's failure to leave the truck's headlights and taillights on or activate its flashers were subsequent acts of negligence. Apodaca argues that the district judge erred by concluding that the exception applies only to acts occurring after Apodaca's arrival at the scene.

*Calvert* states that "[i]t is not the public policy to bar a fire fighter from recovery . . . if the individual responsible for the fire fighter's presence engages in subsequent acts of negligence or misconduct upon the arrival of the fire fighter at the scene." 236 Kan. at 576. Apodaca insists that the phrase "upon the arrival of the fire fighter at the scene" applies only to "misconduct" and not to "subsequent acts of negligence." He also argues that other jurisdictions "draw a distinction between the act of negligence that caused the rescuer to be called to the scene and additional acts of negligence." He cites *Wietecha v. Peoronard*, 102 N.J. 591, 510 A.2d 19 (1986), and *Terhell v. American Commonwealth Associates*, 172 Cal. App. 3d 434, 218 Cal. Rptr. 256 (1985), to support his position.

We disagree with Apodaca's grammatical dissection of the quoted sentence from *Calvert*. In addition, using the arrival of the law enforcement officer on the scene as the temporal starting point for when an act of negligence or misconduct qualifies as "subsequent" is consistent with the language of *Wietecha*. See 102 N.J. at 595-96.

In *Wietecha*, a police officer responded to a traffic accident. While at the scene, another car struck the patrol car. After the second accident occurred, a second officer arrived on the scene. That arrival was followed by a third collision caused by another driver and involving the second officer. In laying out which officers could sue whom, the court couched its decision in terms of events occurring before and after the arrival of each officer at the scene.

> "1. Patrolman 1 may state a claim against the operators of Cars 4 and 5, whose independent negligence occurred after he *arrived at the scene of the accident*, but not against the operators of Cars 1, 2 and 3, whose negligence may have occasioned his presence.
>
> "2. Patrolman 2 may state a claim against only the operator of Car 5, whose independent negligence occurred *after the officer's arrival at the scene of the accident*, but not against the first 4 cars, whose negligence may have occasioned his presence." (Emphases added.) 102 N.J. at 595.

Similarly, the *Terhell* case indicates that additional acts of negligence must occur after the arrival of the officer at the scene: "'"[The firefighter's rule does not] deal with those situations in which the defendant's negligence occurred *after the* [*firefighter*] *arrived at the scene* and materially enhanced the risk of harm or created a new risk of harm."'" (Emphasis added.) *Terhell*, 172 Cal. App. 3d at 440.

29

In a related argument, Apodaca asserts that Willmore's failure to take care to see that the truck was illuminated was independent of his negligence in flipping the truck in the first place. But, even if a subsequent act of negligence occurred, it must also have created a wholly independent risk that did not form the basis for the officer's presence.

For example, the *Terhell* court described a situation in which a plaintiff police officer was injured during hot pursuit of a felony suspect. The officer was hurt "when he continued the pursuit over a fence which gave way due to its dilapidated and unsafe condition." *Terhell*, 172 Cal. App. 3d at 441. Because the "'negligence, if such there were, in no wise created the risk which was the cause of appellant's presence on the property nor could it have provided, within the ambit of the [firefighter]'s rule, any occasion for [plaintiff's] engagement at the time, which was instead a result of wholly independent factors not involving [defendant],'" the firefighter's rule would not bar recovery in such a situation. 172 Cal. App. 3d at 441 (quoting *Kocan v. Garino*, 107 Cal. App. 3d 291, 295-96, 165 Cal. Rptr. 712 [1980]). And, in *Terhell* itself, the court held that a firefighter was not barred from recovery based on "an unguarded hole in the roof" that "was not the cause of [the firefighter's presence] at the scene." *Terhell*, 172 Cal. App. 3d at 441. In short, the question should not merely be whether there is a separate act of negligence by the original tortfeasor after the act creating the need for firefighter or police assistance, but rather whether the firefighter or officer is injured by an independent risk created by the separate negligent act. See *Calvert*, 236 Kan. 570, Syl. ¶ 4 ("A fire fighter only assumes hazards which are known and can be reasonably anticipated at the site of the fire and are a part of fire fighting.").

In this case, it is undisputed that Willmore's alleged subsequent act of negligence in leaving the pickup unlit occurred after he flipped the truck but before Apodaca arrived on the scene. Yet the nature of the risk caused by this act was the same as the risk created by the accident the officers were in the process of responding to. The risk of an

30

unilluminated vehicle blocking the road is inherent in police response to a nighttime traffic accident. Moreover, as observed above, the fact that Willmore's pickup was in the southbound lanes was communicated to 911 dispatch, and, according to the district judge's uncontested findings of fact, that precise information was passed on to Apodaca.

The final exception that Apodaca attempts to rely upon was not among the three enumerated in *Calvert*. He argues that "[m]any jurisdictions have recognized willful and wanton conduct to be an exception under the Fireman's Rule" and urges this court to hold that Willmore's driving under the influence of alcohol was willful, wanton, and reckless behavior allowing Apodaca to seek recovery. Apodaca relies on cases from New Jersey, Illinois, and Michigan to support our approval and application of such an exception in this case. See *Randich v. Pirtano Const. Co.*, 346 Ill. App. 3d 414, 422, 804 N.E.2d 581 (2004) (original rationale for adopting firefighter's rule was premises liability, which would not bar recovery for willful, wanton conduct; current public policy rationale predicated on most fires being caused by negligent acts); *Miller v. Inglis*, 223 Mich. App. 159, 161, 567 N.W.2d 253 (1997) (applying willful, wanton exception to firefighter's rule to allow recovery by officer injured by intoxicated driver while officer assisting at prior accident site); *Mahoney v. Carus Chem. Co., Inc.*, 102 N.J. 564, 573, 510 A.2d 4 (1986) (most fires attributable to negligence; when fire intentionally set, exposing wrongdoer to liability will not place burden on general public "but only upon those whose deliberate conduct warrants the denial of immunity"), *superseded by statute as stated in Ruiz v. Mero*, 189 N.J. 525, 917 A.2d 239 (2007).

Before we can address the merits of this argument, we must consider whether, as the Court of Appeals panel suggested, Apodaca is procedurally barred from raising this exception on appeal. After a thorough review of the record, the panel concluded that no claim of willful, wanton, and reckless conduct by Willmore was raised until a motion to amend judgment was filed several weeks after the district court had entered summary

judgment in favor of the Willmores. And Apodaca did not challenge the district court's rejection of that motion as an abuse of discretion when he took his appeal. See *City of Mission Hills v. Sexton,* 284 Kan. 414, 421, 160 P.3d 812 (2007) (K.S.A. 60-259[a] motion to amend judgment within district court's discretion).

Under these circumstances, we consider Apodaca's argument for recognition of a new exception for willful, wanton, and reckless conduct to have been abandoned. He did not challenge the only district court decision in which application of such an exception would have been considered. See *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014) (issue not adequately briefed deemed abandoned). The Court of Appeals panel need not have proceeded to address the issue of whether the district court ruled appropriately on the motion to amend judgment, and this court is without a procedural avenue to reach the merits of adopting or applying the new exception Apodaca urges upon us.

CONCLUSION

We affirm the decision of the Court of Appeals and the judgment of the district court. The Kansas firefighter's rule first announced in *Calvert*, 236 Kan. 570, Syl. ¶¶ 1-4, is extended to law enforcement officers.

\* \* \*

JOHNSON, J., dissenting:  I dissent from the majority's unjustified expansion of the singularly arbitrary, capricious, and constitutionally suspect firefighter's rule, which was summarily declared to be the public policy of Kansas in *Calvert v. Garvey Elevators, Inc.*, 236 Kan. 570, 694 P.2d 433 (1985). The majority declares that, some 32 years after *Calvert*, it is "the wisest course for Kansas" to deny a remedy by due course of law for

32

injuries suffered by yet another targeted group of professionals, this time labeled "law enforcement officers." Slip op. at 25.

To the contrary, I find it decidedly unwise to cavalierly use a phantom "public policy" to rationalize a new court-made rule, and I fail to see the wisdom in denying an injured person a right to remedy based solely upon his or her job title. Perhaps more importantly, I cannot understand how our Kansas Constitution permits this court to take away the constitutionally protected right to remedy from a group of individuals, while leaving that right intact for others whose job descriptions make them similarly situated with the targeted class.

*Public Policy*

Previously, this court defined public policy as follows: "Public policy consists of the 'principles and standards regarded by the legislature or by the courts as being of fundamental concern to the state and the whole of society.' Black's Law Dictionary 1245 (7th ed. 1999)." *Bolz v. State Farm Mut. Ins. Co*., 274 Kan. 420, 424, 52 P.3d 898 (2002). I must confess to being unable to grasp the public policy that *Calvert* was promoting with its new rule. The opinion repeatedly describes the public policy by simply stating the rule, without identifying the principles and standards with which the state and society are fundamentally concerned, *e.g.*:

> "[I]t is a public policy of the State of Kansas that a fire fighter cannot recover for injuries caused by the very wrong that initially required his presence in an official capacity and subjected the fire fighter to harm; that public policy precludes recovery against an individual whose negligence created a need for the presence of the fire fighter at the scene in his professional capacity." *Calvert*, 236 Kan. at 576.

33

*Calvert* did not purport to change the common law relating to torts to effect some greater public good. The opinion did not abolish the rescue doctrine. It did not state that taxpayer-paid professionals assume the risk of sustaining foreseeable injuries caused by the very negligence that created the need for the professional's presence at the scene of the tortfeasor's negligence. It did not declare that a citizen owes only a limited duty to a taxpayer-paid professional that responds to an emergency for which the professional owes a public duty to handle. Rather, it changed the law only as it relates to the class of people that are labeled "firefighters." That it intended to take away a right of recovery only from firefighters is evidenced by the opinion's rationalization that "[i]n populous areas fire fighters are first concerned with keeping a fire confined and preventing it from spreading to other structures." 236 Kan. at 576.

Consequently, the principles of tort law and the elements of a negligence cause of action remained the same for all others who were similarly situated with respect to job duties and responsibilities. Pointedly, that included law enforcement officers. *Calvert* did not explain the policy being furthered by denying a firefighter his or her common-law cause of action, while allowing a law enforcement officer his or her remedy at law, perhaps where both were responding to the same accident.

Indeed, *Calvert* left some questions as to exactly who might qualify for its selective exclusion from the courtroom. The facts of that case did not have Calvert fighting a fire to keep it from spreading to adjoining property. Instead, he was attempting to save a person overcome by the fumes of leaking anhydrous ammonia, *i.e.*, performing the duties of an emergency medical technician (EMT). *Calvert* skimmed over that factual distinction by saying that "[o]ne of the purposes of Calvert's employment as a fire fighter was to protect the public in situations where poisonous gas escapes." 236 Kan. at 576. Query:  Would *Calvert* have applied its firefighter's rule to an EMT on an ambulance crew who did not also fight fires? If not, what policy supports treating two EMTs

34

differently just because one also fights fires? If so, what other nonfirefighters would be included in the firefighter's rule?

Likewise, the majority in this case fails to clarify who qualifies for its expanded "law enforcement officer" exclusionary rule. Does it include the guards in the atrium of the Kansas Judicial Center? What about the correctional officers at a privately run penitentiary? The point is that arbitrary rules promulgated without the guidance of a stated, defined public policy are not the wisest course for this state.

The Court of Appeals in this case apparently noticed the absence of any stated policy reasons in the *Calvert* opinion that would justify singling out firefighters to strip of the common-law right to recover for negligently caused injuries. It attempted to proffer policy reasons for taking away those rights from both firefighters and law enforcement officers. That purported justification, which is cited by the majority, states:

> "[A]s public safety officers—both firefighters and law enforcement officers—are called upon to respond to a wide range of emergencies in their official capacities. They do so not because of any private duty owed to an individual but because of their sworn duty to the public as a whole. Moreover, like firefighters, law enforcement officers are employed at the taxpayers' expense for the express purpose of dealing with such emergencies. It would be fundamentally unfair to allow a law enforcement officer to seek to recover damages from one who causes an automobile accident but deny this right to a firefighter injured while responding to the same accident." *Apodaca v. Willmore*, 51 Kan. App. 2d 534, 544, 349 P.3d 481 (2015).

But the panel's fundamental unfairness rationale actually highlights my point that there is no public policy that supports stripping targeted professions of a right to a remedy. In addition to firefighters and law enforcement officers, one can envision many other examples of governmental employees who fit the mold formed by *Calvert* and the

35

Court of Appeals. A city building inspector sent to a neglected and dilapidated house to begin enforcement of the city's unsafe structure ordinance and who falls through the porch has sustained "injuries caused by the very wrong that initially required his presence in an official capacity and subjected the [inspector] to harm." See *Calvert*, 236 Kan. at 576. Likewise, a municipal utility worker who is electrocuted after being called to the scene of a downed powerline, knocked over by the landowner, has sustained injuries arising out of the very negligence that required the worker's presence at the scene. Moreover, both the inspector and the utility worker "are employed at the taxpayers' expense for the express purpose of dealing with such emergencies," and both have a sworn duty to the city as a whole. *Apodaca*, 51 Kan. App. 2d at 544. Yet, the building inspector and utility worker still retain a remedy at law for their injuries, but firefighters and law enforcement officers do not. Where is the public policy justification for that discrimination? Is the state and society as a whole fundamentally concerned with furthering the principle and standard that access to justice is to be based on your job title, rather than on what you do?

Moreover, the suggestion that firefighters and law enforcement officers have already been paid by the taxpayers and should not get the windfall of being paid again is the type of fallacious logic that produces today's popular partisan soundbites. Those public servants are being paid to perform their duties, NOT to sustain injuries. Indeed, the shameful pittance of a salary the taxpayers pay these people to keep the rest of us safe can certainly not cover their added costs after being hurt on the job. And what about the many volunteer firefighters that protect our smaller cities and townships? Moreover, as a taxpayer, I am honored to pay my share of the cost to employ, train, and maintain our firefighters and law enforcement officers, but I object to paying for the additional costs caused by tortfeasors, who should be responsible for their own actions. *Cf. Zak v. Riffel*, 34 Kan. App. 2d 93, 106, 115 P.3d 165 (2005) ("If there is to be a windfall, it should benefit the injured party rather than the tortfeasor.").

36

Even more curious to me is that the majority would make such a tectonic shift away from the modern concept of comparative fault by treating "public policy" as if it were an evanescent and whimsical principle. Even the author of *Calvert* would later take a Court of Appeals panel to the woodshed for relying on public policy as a rationale for altering fixed principles. See *O'Bryan v. Columbia Ins. Group.*, 274 Kan. 572, 575, 56 P.3d 789 (2002) ("We have previously acknowledged that the declaration of public policy is primarily a legislative function."). And more recently, this court has looked critically at the function of public policy in our decision-and-rule-making endeavors. See *Campbell v. Husky Hogs,* 292 Kan. 225, 255 P.3d 1 (2011). Specifically, *Campbell* instructed:

"We have stated that courts tasked with determining whether a public policy exists are faced with three situations: (1) The legislature has clearly declared the state's public policy; (2) the legislature enacted statutory provisions from which public policy may reasonably be implied, even though it is not directly declared; and (3) the legislature has neither made a clear statement of public policy nor can it be reasonably implied. *Coleman* [*v. Safeway Stores, Inc.*], 242 Kan. [804], 808[, 752 P.2d 645 (1988)]. We also have held that public policy must be clearly declared by the constitution, statutory enactments, or the courts, and it must be '"so united and so definite and fixed that its existence is not subject to any substantial doubt."' *Hysten* [*v. Burlington Northern Santa Fe Ry. Co.*], 277 Kan. [551], 555[, 85 P.3d 1183 (2004)] (citing *Riddle v. Wal-Mart Stores, Inc.,* 27 Kan. App. 2d 79, 998 P.2d 114 [2000]). We also have acknowledged that while public policy may be determined by both the legislature and the courts, courts must respect legislative expressions when ascertaining whether a public policy exists. *Coleman,* 242 Kan. at 808." 292 Kan. at 230.

The legislative expression was arguably made when it determined that a jury should look to the comparative fault of each party, rather than apply such artificial rules as contributory negligence. See K.S.A. 60-258a. Certainly, in the three decades since *Calvert*, the legislature has not seen fit to expand the court-made public policy rule of

37

*Calvert* to anyone beyond firefighters. Pointedly, I do not see the majority declaring that the public policy behind its law enforcement officer rule is """so united and so definite and fixed that its existence is not subject to any substantial doubt.""" *Campbell*, 292 Kan. at 230. This dissent is testament to my substantial doubt.

In short, the majority provides no logical reason for targeting job descriptions to deny a right to remedy. While there may be legitimate reasons to change the common law with respect to the duty owed to a taxpayer-paid emergency worker, there is no justification that one can conceive, public policy notwithstanding, to discriminate on the basis of job title. Moreover, the legislature's prolonged failure to expand *Calvert* beyond its firefighter holding should counsel against this court's activism in this case.

*Constitutional Concerns*

Nevertheless, I view the infirmities in the majority's opinion to run deeper than just a quibble over the appropriate public policy to enforce in this state. The majority acknowledges that, prior to *Calvert,* the common law in this state would have allowed both firefighters and law enforcement officers to sue for their injuries. Consequently, that right was constitutionally protected against arbitrary abolition. Specifically, our Kansas Constitution Bill of Rights § 18 guarantees: "*All persons*, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." (Emphasis added.) "Section 18 provides 'an injured party . . . a constitutional right to be made whole and a right to damages for economic and noneconomic losses suffered.'" *Miller v. Johnson*, 295 Kan. 636, 655, 289 P.3d 1098 (2012) (quoting *Samsel v. Wheeler Transport Services, Inc.,* 246 Kan. 336, 353, 789 P.2d 541 [1990]).

Pointedly, our constitutional right to a remedy does not exempt law enforcement officers, or even law enforcement officers who are responding to an emergency call. *Cf.* Kansas Constitution Bill of Rights § 1 ("All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."). Yet, today, the majority denies a law enforcement officer a remedy by due course of law for personal injuries suffered because it deems that public policy to be "the wisest course for Kansas." Slip op. at 25.

As noted above, "[t]he declaration of public policy is primarily a legislative function." *Noel v. Menninger Foundation,* 175 Kan. 751, Syl. ¶ 4, 267 P.2d 934 (1954). Yet, ironically, I submit that the legislature could not have done what the majority does today. Public policy—whether wise or inscrutable—is an insufficient basis, standing alone, for the legislature to abolish or restrict a remedy protected by Section 18. In *Miller* we explained that public policy is only the first step in testing the constitutionality of a legislative modification to a common-law remedy. *Miller*, 295 Kan. at 657. A reviewing court must also find that "the legislature substituted an adequate statutory remedy for the modification to the individual right at issue." 295 Kan. at 657. Otherwise, it would be "this court's duty to police legislative infringement of Kansas citizens' constitutional rights." 295 Kan. at 690 (Beier, J., dissenting).

Nevertheless, the majority, all members of which took an oath to support the Constitution of the State of Kansas, is, by judicial fiat, denying a segment of Kansas citizens their right to remedy under that same constitution. Moreover, as suggested above, the majority fails to present any rational basis to carve out law enforcement officers to deny the equal protection of the law enjoyed by similarly situated professionals.

Lest one is tempted to point to the Workers Compensation Act as an adequate substitute remedy for the denial of a right to remedy for law enforcement officers, I

39

would make a couple of observations in that regard. First, workers compensation benefits are intended to be an adequate substitute remedy for the abolishment of a worker's right to sue his or her employer, not the right to sue an unrelated tortfeasor. In fact, where a worker is injured by the negligence of someone not associated with the worker's employer, the worker "shall have the right to take compensation under the workers compensation act and pursue a remedy by proper action in a court of competent jurisdiction against such other person." K.S.A. 44-504(a). One might also ruminate on whether the judicial abolition of the worker's right to pursue a remedy against the tortfeasor impacts on the adequacy of the remedy provided by the remaining provisions of the Workers Compensation Act. But that may be a matter for another day.

In short, I would reverse both the Court of Appeals and the district court.

BILES, J., joins in the foregoing dissenting opinion, agreeing with the public policy reasoning stated in Justice Johnson's dissent.

\* \* \*

STEGALL, J., dissenting: This case asks us to choose between a rule and a standard. See Korobkin, *Behavioral Analysis and Legal Form: Rules vs. Standards Revisited*, 79 Or. L. Rev. 23, 25-30 (2000) (reciting extensive scholarship on rules and standards). I agree with my colleagues in the majority that Kansas has a "firefighter's rule" and that it extends to law enforcement officers. But I do not agree with the characterization of the principle—common to our past caselaw as well as to both today's majority and Justice Lee Johnson's dissent—as a "rule" made by courts imposing judicial policy preferences as a matter of law.

In fact, the "rule" is not a true rule at all, but a standard. When courts refer to a "firefighter's rule," the term can only properly be understood as a shorthand expression of a traditional duty standard found in the common law of tort. Today's case illustrates the problems that arise when we confuse a standard for a rule.

## INTRODUCTION

In 1934, Justice Benjamin Cardozo warned of the "need for caution in framing standards of behavior that amount to rules of law." *Pokora v. Wabash Ry. Co.*, 292 U.S. 98, 105, 54 S. Ct. 580, 78 L. Ed. 1149 (1934); see *Mashaney v. Board of Indigents' Defense Services*, 302 Kan. 625, 652-55, 355 P.3d 667 (2015) (Stegall, J., concurring) (arguing that traditional tort principles are better suited to resolving negligence claims than are artificial rules imposed as a matter of law). In Kansas, the standards of tort law remain reasonably robust and sufficiently supple to accomplish the stated policy goals of the majority without trampling on what I discern to be the dual concerns of Justice Johnson's dissent—*i.e.*, that the majority diminishes the proper role of Kansas juries and exaggerates the proper role of appellate courts.

Because the decision to apply a rule is a question of law, that decision will always be made by appellate judges (either directly on appeal or indirectly by district judges applying appellate precedent). The application of a true rule to a case has the tendency to end it, or at least narrow it considerably, as a matter of law. But the application of a standard, while setting the legal parameters of any possible final resolution, leaves work to be done. See Sunstein, *Problems with Rules*, 83 Cal. L. Rev. 953, 959-68 (1995) (in depth analysis of the "continuum from rules to untrammeled discretion, with factors, guidelines, and standards falling in between"); see also *Pirates of the Caribbean: The Curse of the Black Pearl* (Walt Disney Pictures 2003) (Infamous pirate, Captain Hector Barbossa, invoking this continuum to justify his discretionary decision to deny a captive's

appeal for release pursuant to the requirements of pirate law, explaining: "The Code is more what you'd call 'guidelines' than actual rules.").

Evaluating human action against a standard requires discretion, weighing evidence, making credibility determinations, resolving factual disputes, and ultimately the application of societal values or other potentially elusive concepts such as "reasonableness." Owing either to practical realities or structural restraints on the power of the judiciary, appellate judges are ill-suited to these activities. As such, carrying out these functions is generally left to other decision makers—district court judges and, notably, juries.

Or putting it another way:

> "[W]hen all [the] legal rules have been exhausted and have yielded no answer, we call what remains to be decided a question of fact—which means not only that it is meant for the jury rather than the judge, but also that there is no single 'right' answer. It could go either way. Only . . . at the margins can an appellate judge say that this determination *must* come out the other way *as a matter of law*." Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1181 (1989).

Thus, the choice between a rule and a standard is always in part about allocating power—who gets to decide the ultimate outcome of a specific dispute?

Recasting (or miscasting) a standard of conduct as a rule of law has the practical—if not always intended—effect of appropriating for appellate judges the fact-finding and discretionary function of juries. We ought to avoid this. When we do not, experience teaches us that such "rules" will inevitably be layered with exceptions; complicated with multiple-factor balancing tests; and constructed on the perilous sands of shifting public policy. When one finds rules with these characteristics—such as the "firefighter's rule"

described and applied today—one may be justly suspicious that appellate courts are acting beyond their institutional competency.

Far from providing stability, predictability, and a constraint on judicial whims, these standards-masquerading-as-rules instead permit appellate judges "to announce that, 'on balance,' we think the law was violated here—leaving ourselves free to say in the next case that, 'on balance,' it was not." Scalia, 56 U. Chi. L. Rev. at 1179-80; see *Solomon v. State*, 303 Kan. 512, 544, 364 P.3d 536 (2015) (Stegall, J., concurring) (arguing that multiple-factor balancing tests may amount to "mere fig-leafing to cover [an] unsightly exercise of judicial willfulness").

This is not to suggest that judicially created standards are not law. For example, when not abrogated by statute, setting binding common-law standards of behavior is undoubtedly within the traditional province of the judiciary to "say what the law is." *Marbury v. Madison*, 5 U.S. [1 Cranch] 137, 177, 2 L. Ed. 60 (1803); see *Gannon v. State*, 303 Kan. 682, 737, 368 P.3d 1024 (2016). "[T]he establishment of broadly applicable general principles is an essential component of the judicial process." Scalia, 56 U. Chi. L. Rev. at 1185.

Nowhere is this truer than in the realm of common-law tort where such standards are well settled. Duty standards—*e.g.*, "The duty that is owed in a negligence action is one of reasonable care," *Shirley v. Glass*, 297 Kan. 888, ¶ 10, 308 P.3d 1 (2013)—are the classic example. But, "[g]eneral propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76, 25 S. Ct. 539, 49 L. Ed. 937 (1905) (Holmes, J., dissenting), *abrogated by West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937). And while Justice Holmes' dictum cannot be universally maintained across all disciplines of the law, it is most to be heeded in the realm of tort where outcomes "must be determined by the peculiar facts and circumstances of the particular case, on mixed

considerations of logic, common sense, justice, policy, and precedent." See 65 C.J.S., Negligence § 188.

## ANALYSIS

Given these considerations, I would modify in application the so-called "firefighter's rule" announced in *Calvert v. Garvey Elevators, Inc.*, 236 Kan. 570, 576, 694 P.2d 433 (1985), by explicitly framing it as a duty standard deeply rooted in the common law of tort. Furthermore, I would hold that this duty standard applies equally to cases involving law enforcement officers.

Looking at *Calvert* through the "rules and standards" lens helpfully decodes some of the decision's loose and meandering reasoning. Doing so brings a number of clues into sharp relief against the fuzzy backdrop of judicial policy making. And these clues all point to the inevitable conclusion that the "rule" announced in *Calvert* is actually nothing more—or less—than a duty standard.

To begin, the *Calvert* court implicitly recognized the "standards" nature of the point of law in question. Summing up its perception of the issue as already decided in other jurisdictions, our court concluded:

> "[T]he fire fighter cannot complain of negligence in the creation of the very occasion for his employment. He assumes the risks normally associated with the fire fighting when he enters that employment. . . .
>
> . . . .
>
> ". . . Normally it has been held that, apart from active negligence, *i.e.*, the failure to warn of hidden dangers and statutory violations, the owner or occupant of premises

44

owes to a fire fighter either no duty of care to keep the premises safe or only the duty to refrain from inflicting willful or wanton injuries upon him." 236 Kan. at 572.

Here, we correctly identified the character of what had by that time already become shorthanded as the firefighter's rule—*i.e.*, the rule was simply an articulation of the proper duty of care owed to firefighters.

The *Calvert* court lost its way, however, when it attempted to attach a specific legal theory to the rule, thus justifying its application. The court began by rejecting a number of candidate theories, including theories arising out of the law of premises liability and master-servant assumption of risk. 236 Kan. at 572-76. In the process, the *Calvert* court also rejected the idea that the firefighter's rule was in reality a duty standard to be applied like any other duty standard in the context of a negligence action. Having discerned no solid foundation in traditional legal reasoning or precedent, the *Calvert* court chose to simply declare a rule based exclusively on public policy. 236 Kan. at 576 ("We now hold that it is a public policy of the State of Kansas that . . . .").

This result is perplexing as the *Calvert* court had, clearly at hand, an appropriate rationale grounded solidly in traditional tort law—a rationale which made absolutely clear that the principle governing these negligence actions was a particular *species* of the standard of care *genus* that has governed all negligence cases in the history of our courts. Unfortunately, that rationale was known as the doctrine of "primary assumption of risk"—nearly indistinguishable in name from the legally distinct common-law *defense* of "assumption of risk." Still, the *Calvert* court did acknowledge that the primary assumption of risk doctrine was not actually the same as the assumption of risk *defense* to negligence claims.

"Primary assumption of the risk technically is not a defense, but rather a legal theory which relieves an individual of a duty which he might otherwise owe another with respect

to a particular risk. . . . Primary assumption of risk, therefore, is a doctrine which limits the duty owed by the occupier of the premises to the fire fighter." 236 Kan. at 574.

But then, inexplicably, the *Calvert* court concluded, with no discussion or analysis, that the "the firefighter's rule" could not be explained in Kansas as a *standard* limiting the scope of duty owed to firefighters because earlier precedent from our court had restricted "the doctrine of assumption of risk . . . to cases where a master/servant relationship is involved." 236 Kan. at 574. As explained below, those cases concerned only the common law *defense* known as assumption of risk. In retrospect, it appears clear to me that the *Calvert* court's rejection of the duty standard rubric was unwitting and stemmed from blurring the line separating distinct legal doctrines saddled with confusingly similar names.

The case *Calvert* relied on for its declaration that the primary assumption of risk doctrine was no longer applicable in Kansas was *Jackson v. City of Kansas City*, 235 Kan. 278, 301-06, 680 P.2d 877 (1984), *overruled by Simmons v. Porter*, 298 Kan. 299, 312 P.3d 345 (2013). The issue resolved by *Jackson* was whether "the adoption of comparative fault (K.S.A. 60-258a) abolished the common law defense of assumption of risk?" 235 Kan. at 301. After thorough discussion of the issue, *Jackson* recognized that the defense of assumption of risk had been statutorily overtaken by comparative fault principles in many cases, but it remained a viable defense when "limited to cases involving the master-servant relationship." 235 Kan. at 305.

*Jackson* cited in turn to our earlier decision in *Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P.2d 1062 (1973). In *Smith*, we made it clear that the common-law *defense* of assumption of risk operates to excuse a negligent party from liability to the extent the injured party violated his or her own duty—*i.e.*, was also negligent. 213 Kan. at 101-02. At that time, the more recent—and now very familiar—concepts of contributory

46

negligence and comparative fault were coming to occupy that particular field. In consequence, *Smith* held that the common-law defense of assumption of risk "results in confusion when an attempt is made to harmonize it with or differentiate it from contributory negligence." 213 Kan. at 101. We then quoted favorably from a decision by the Michigan Supreme Court in *Felgner v. Anderson*, 375 Mich. 23, 133 N.W.2d 136 (1965), to the effect that:

> "'Assumption of risk should not again be used in this State as a substitute for, or as a supplement to, or as a corollary of, contributory negligence . . . . The traditional concepts of contributory negligence are more than ample to present that affirmative defense to established negligent acts.'" *Smith*, 213 Kan. at 102 (quoting *Felgner*, 375 Mich. at 56).

The *Smith* court chose to retain the defense of assumption of risk in limited circumstances because "its application is deeply imbedded in our master-servant case law." 213 Kan. at 101. And of course, more recent caselaw has entirely disembedded its application. See *Simmons*, 298 Kan. 299, Syl. ¶ 6 ("The rationale for retaining the assumption of risk doctrine is no longer viable in Kansas given statutory comparative fault rules and subsequent caselaw. Prior caselaw applying the assumption of risk doctrine to bar recovery is overruled.").

Here can be discerned the genesis of the problems we have grappled with today. Keeping firmly in mind that the doctrine of primary assumption of risk is, in reality, a limited duty standard, it becomes plain that *Jackson* did not do what the *Calvert* court thought it did. In *Calvert*, this court needlessly and carelessly jettisoned the sound tort principles reflected in the primary assumption of risk doctrine. That doctrine expresses a duty standard which may result in a determination that there was *no negligence in the first place* because no duty was violated. As a legal theory, primary assumption of risk is thus entirely distinct from the common-law defense also flying under the "assumption of

47

risk" flag which—prior to being rendered obsolete by newer notions of comparative fault—could excuse a defendant for liability for the defendant's otherwise negligent acts.

It is noteworthy that latent difficulties stemming from this confusion are made manifest in both *Calvert* and the majority opinion today. Both decisions sound implicitly discordant notes. For example, *Calvert* claims that its "rule" means that firefighters "assume[] hazards which are known and can be reasonably anticipated at the site of the fire and are a part of fire fighting"—an articulation that sounds remarkably like the doctrine of primary assumption of risk. 236 Kan. at 576. More expressly, the majority today justifies the rule by invoking the "broader legal context of the rule" which demonstrates that the rule deals "with [the] establishment of a duty, and a duty is an element of negligence." Slip op. at 23.

But rather than work through the implications of these stray puzzle pieces that stubbornly resist a neat fit with the overall picture of public policy we have pieced together, both decisions prefer to ring down the final curtain on the primary assumption of risk doctrine and move on. See slip op. at 22. The *Calvert* court simply got this wrong. And though—given the state of our precedent—the approach taken by the majority is understandable, it is, I think, a mistake.

The duty standard known as the "firefighter's rule" is "based on a principle as fundamental to our law today as it was centuries ago. The principle is not unique to landowner cases but is applicable to our entire system of justice." *Walters v. Sloan*, 20 Cal. 3d 199, 204, 142 Cal. Rptr. 152, 571 P.2d 609 (1977), *disapproved of by Neighbarger v. Irwin Industries, Inc.*, 8 Cal. 4th 532, 541, 34 Cal. Rptr. 630, 882 P.2d 347 (1994) (preferring to jettison even the nomenclature of assumption of risk and expressly state that "the proper basis for the firefighter's rule . . . is a legal conclusion that the person who starts a fire owes no duty of care to the firefighter who is called to

48

respond to the fire"). The principle is expressed in the maxim *volenti non fit injuria* and mandates that "one who has knowingly and voluntarily confronted a hazard cannot recover for injuries sustained thereby." *Walters*, 20 Cal. 3d at 204.

Applying these principles to firefighters, the Minnesota Supreme Court in *Armstrong v. Mailand*, 284 N.W.2d 343 (Minn. 1979), first observed:

> "The doctrine of primary assumption of the risk technically is not a defense, but rather a legal theory which relieves a defendant of a duty which he might otherwise owe to the plaintiff with respect to particular risks. . . . Primary assumption of the risk, therefore, is a doctrine which defines the limits of the defendant's duty. Its application is dependent upon the plaintiff's manifestation of consent, express or implied, to relieve the defendant of a duty." 284 N.W.2d at 351.

Which is to say, a firefighter or law enforcement officer not only voluntarily confronts the known and reasonably anticipated hazards of his or her work, but does so heroically in a manner that affirmatively relieves persons of duties they would otherwise owe. Thus, "[a]s to those risks, the defendant has no duty to protect the plaintiff" and if an injury arises from such a risk, "the defendant is not negligent." *Olson v. Hansen*, 299 Minn. 39, 44, 216 N.W.2d 124 (1974).

It is true, though largely beside the point, that this is consonant with all of the public policy factors identified by the majority. But it is the existence and scope of a duty—or lack thereof—which should be our primary concern. Keeping the focus where it ought to be, the *Armstrong* court thus articulated the limited duty standard this way: "[A] fireman may not recover damages . . . if his injury is caused by a reasonably apparent risk. But, he may recover if his injury is caused by a hidden or unanticipated risk attributable to . . . negligence." 284 N.W.2d at 350.

I would articulate the principle as an express description of the scope of duty owed to the plaintiffs in this case—*i.e.*, the plaintiffs were generally owed a duty of reasonable care; however, as to the known or reasonably apparent risks and hazards encountered in the ordinary course of their jobs as law enforcement officers, the plaintiffs were owed no duty because they voluntarily relieved the public of that duty. And despite the *Calvert* court's confusion, there is nothing in any of our prior caselaw to prevent the adoption of this clearly defined duty standard.

Moreover, the expression of the "rule" as a limited duty standard has the advantage of being entirely consistent with the animating spirit of *Calvert* which maintained that firefighters "assume[] hazards which are known and can be reasonably anticipated at the site of the fire and are a part of fire fighting." 236 Kan. at 576. And importantly, the limited duty standard set forth here subsumes within the standard itself all of the articulated exceptions to the rule set out by the majority. Thus, for example, individuals are not relieved of the duty of reasonable care towards firefighters or police officers in the manner in which they call for assistance; or for hidden dangers; or for acts unrelated to the reason for the firefighters' or officers' presence on the scene. And the standard has no application to causes of action which do not require any duty at all, such as intentional torts.

Finally, in addition to the already described benefits of this approach, it has the added virtue of saving courts from the unenviable position of having to reason by analogy between various positions of public service—*e.g.*, firefighter, police officer, ambulance driver, building inspector, etc.—based on "public policy." See slip op. at 34-35 (Johnson, J., dissenting) ("In addition to firefighters and law enforcement officers, one can envision many other examples of governmental employees who fit the mold formed by *Calvert* . . . . the building inspector and utility worker still retain a remedy at law for their injuries, but firefighters and law enforcement officers do not. Where is the public policy

50

justification for that discrimination?"). Rather, everyone can be evaluated based on the same duty standard as it arises out of longstanding and traditional principles of the common law of tort.

As with any negligence action, simply deciding the appropriate duty standard to apply does not end the case. Work remains, and such is true here. For example, did the defendants violate any duty in the manner in which the officers were called to the scene? Was the fact that the defendant turned off the lights of his disabled vehicle a known or reasonably apparent risk encountered by the plaintiffs in the ordinary course of being law enforcement officers?

When freed from the burden of deciding—as a matter of law—whether a judicially crafted rule bars recovery in this case, it should become clear that these questions, and possibly others, are for the jury to answer when it undertakes its traditional role to determine whether the defendant violated his or her duty to the plaintiff. Having given clear contours to that duty, an appellate court should do no more.

CONCLUSION

In the end, the substantive content of the primary assumption of risk doctrine is preserved in *Calvert* and extended today to cover law enforcement officers. But instead of being characterized as a traditional duty standard, the substance of the law has been retrofitted as a judicially created "rule" of public policy with policy and equity based exceptions. The primary difference between the two—as explained above—is who decides. Juries generally decide whether a duty was violated while appellate judges get to decide whether a rule of law bars a claim.

In my view, the duty standard I have enunciated takes the law—*qua* law—as far as it can go. Given that the job of an appellate judge is to expound the law, this is where I would stop. Kansas juries are quite capable of finishing the job. And absent a recognized reason for invalidating a jury verdict, we ought to "tolerate a fair degree of diversity in what juries determine to be negligence." Scalia, 56 U. Chi. L. Rev. at 1186. Because I would reverse the rulings of the district court and the Court of Appeals and remand the matter to the district court to apply the correct legal standard—as opposed to applying a rule that simply ends the case as a matter of law—I dissent.